UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LORI CHAVEZ-DEREMER Secretary of Labor, United States Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:21-cv-02160-SEB-TAB |
| HEAL AT HOME, LLC an Indiana company, TPS CAREGIVING, LLC an Indiana company     d/b/a COMFORT KEEPERS, TIMOTHY PAUL an individual, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On July 10, 2024, Plaintiff Secretary of Labor Lori Chavez-DeRemer (the "Secretary") filed a petition seeking to hold Defendants Heal at Home, LLC, TPS Caregiving, LLC d/b/a Comfort Keepers, and Timothy Paul ("Defendants") in contempt for a violation of the terms of the Consent Judgment entered by the Court on January 20, 2022, which requires Defendants to adhere to the overtime provisions of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 207. Now before the Court are the parties' cross-motions for summary judgment. Dkt. 47, 50. For the reasons discussed below, Defendants' Motion for Summary judgment, dkt. 47, is **GRANTED**, and the Secretary's Motion for Summary Judgment, dkt. 50, is **DENIED**.

1

# BACKGROUND

The underlying material facts are largely undisputed, reflecting the parties' agreement that their "central dispute . . . is a legal one." Dkt. 51 at 48; dkt. 60 at 5. The Secretary nonetheless has interposed a host of evidentiary objections to Defendants' factual assertions, almost exclusively on the basis of relevance. Dkt. 51 at 12–15, 17–19, 22, 31–38, 40. Consistent with our task on summary judgment, the factual background provided herein incorporates only the undisputed and material (i.e., relevant) facts, as supported by the record before us. We note and address the Secretary's objections insofar as is necessary below.

## I.    Defendants' Business Operations

Defendant Timothy Paul ("Mr. Paul") is the sole owner of co-Defendants TPS Caregiving, LLC d/b/a Comfort Keepers ("Comfort Keepers") and Heal at Home, LLC ("Heal at Home"). Paul Dep. 14:24–15:5, 18:4–6, dkt. 47-1. Comfort Keepers is a personal services agency that offers its clients individualized care and assistance with daily living activities, such as meal preparation, transportation to and from medical appointments, prescription medication pickup and delivery, grocery shopping, and light housekeeping. *Id.* at 14:8–15:2. Heal at Home is a home health agency providing "more of a hands-on" level of care by assisting its clients with bathing, incontinence toilet training, and exercise. *Id.* at 15:10–13. Often, Comfort Keepers and Heal at Home employ the same personnel, collectively referred to as "field staff," who are enlisted in accordance with clients' needs. When providing services on behalf of Comfort Keepers, field staff members are referred to as

"caregivers," and when providing services on behalf of Heal at Home, they are referred to as "home health aides." *Id.* at 21:23–22:11.

Approximately ninety percent of Comfort Keepers' and Heal at Home's clients are insured through Medicaid, *id.* at 64:14–15, which makes the threshold determination of whether a specific patient qualifies for home assistance, *id.* at 36:20–23. If approved for home assistance, qualifying patients are assigned to CICOA Aging & In-Home Solutions ("CICOA"), an Indiana-based non-profit case management company that "oversee[s] the delegation of hours." *Id.* at 36:3–37:17. CICOA conducts individualized patient evaluations to "determine how many hours [are] necessary . . . to live a . . . comfortable lifestyle with the assistance of a caregiver." *Id.* Thereafter, Medicaid-approved patients receive a "notice of action" informing them of their "care hour" allotment and instructing them that they may seek the assistance of a personal services agency, such as Comfort Keepers or Heal at Home. *Id.* According to Lacey Osborn ("Ms. Osborn"), Comfort Keepers's Executive Director, care hours are typically reviewed every six months and/or in the event of a sudden change in the patient's medical condition. Osborn Decl. ¶ 6, dkt. 61-1.

Medicaid reimburses Comfort Keepers and Heal at Home at a fixed rate for each hour of care worked by members of the field staff, who themselves are compensated by their employer(s) at an hourly rate. Paul Dep. 38:20–39:1, dkt. 47-1. In July 2023, after Medicaid reimbursement rates had been stagnant throughout the preceding six years, they increased for Comfort Keepers and Heal at Home from $23.28 to $34.23, and from $19.11 to $28.00, respectively. *Id.* at 43:24–44:22, 66:15–24, 77:4–78:10. (By contrast, private insurance companies, which cover approximately ten percent of Defendants' clients, pay

3

an average reimbursement rate of $28.00 per hour of care. *Id.* at 64:2–22, 67:3–12.) Medicaid reimbursement rates do not include the time-and-a-half overtime premium that Comfort Keepers and Heal at Home must pay when a patient's assigned caregiver works more than forty hours in a workweek. *Id.* at 52:12–21. Nevertheless, the increased Medicaid reimbursement rates allow Mr. Paul to operate at a gross profit margin of approximately thirty-four percent, compared to his pre-July 2023 gross profit margins of twelve to sixteen percent. *Id.* at 68:12–69:1.

Based in part on certain, self-conducted "market surveys"—that is, telephone conversations with competing homecare enterprises about their wages and benefit packages—Mr. Paul offers field staff a starting wage of $16.00 per hour. *Id.* at 48:12–49:15. (Prior to July 2023, the starting wage was $14.00 per hour.) According to Mr. Paul's deposition testimony, the base rate of pay may differ among his employees, depending on their respective experience in the field and/or whether the employee "wants to play hard" and negotiate. *Id.* at 51:5–16, 53:15–22.

## II.    The 2020 Investigation of Defendants' Payroll Practices

In April 2020, the Department of Labor (the "Department") initiated an investigation of Comfort Keepers's and Heal at Home's payroll practices, specifically, with regard to their compliance with the FLSA's overtime requirements (hereinafter referred to as the "2020 Investigation"). Kennedy Decl. ¶ 13, dkt. 26-2 (Declaration of Wage and Hour Division Investigator Meghann Kennedy); Paul Decl. ¶ 7, dkt. 47-5. At that time, for payroll purposes, Mr. Paul treated Comfort Keepers and Heal at Home as separate entities and thus did not aggregate field staff members' weekly hours in calculating overtime compensation.

In February 2021, the Department concluded that Comfort Keepers and Heal at Home operate as "one enterprise" and constitute "joint employers" within the meaning of the FLSA. Kennedy Decl. ¶ 14, dkt. 26-2. Therefore, the Department concluded, Defendants' failure to calculate overtime premiums using field staff members' total hours worked (on behalf of both entities) violated the FLSA's requirement that employers must pay their employees at one-and-one-half times their regular hourly rates for all hours worked in excess of forty hours in a workweek.

## III.    The Consent Judgment

Based on the findings and conclusions yielded by the 2020 Investigation, the Secretary filed this (underlying) lawsuit on August 2, 2021, asserting that Defendants failed to combine hours worked on behalf of both entities for purposes of calculating overtime premiums, in violation of §§ 7 and 15(a)(2) of the FLSA. Approximately two-and-a-half months later, on October 19, 2021, the parties notified the Court that they had "drafted and exchanged a Consent Judgment that fully resolves this matter." Dkt. 14 at 1. On December 3, 2021, the parties filed the Consent Judgment, which we approved and entered on January 20, 2022. Dkt. 20, 23.

Under the Consent Judgment, Defendants stipulated to the entry of judgment against them. The Consent Judgment further provides that Defendants are "permanently enjoined and restrained" from violating the FLSA "in any of the following manners": Pursuant to §§ 7 and 15(a)(2) of the FLSA, Defendants shall not "employ any nonexempt employees . . . for workweeks longer than 40 hours, unless such employees receive compensation for their employment in excess of 40 hours at a rate not less than one and one-half times the regular

rates at which they are employed"; nor shall Defendants "fail to combine hours worked by employees at both companies . . . during a workweek for purposes of calculating overtime premiums." Dkt. 20 at 1–2. Defendants were also directed to pay the sum total of $432,798.54 in back wages and liquidated damages, covering a period from April 30, 2019, to April 11, 2020, as well as post-judgment interest. *Id.* at 2.

## IV. Consent Judgment Implementation

Soon after the entry of the Consent Judgment, Mr. Paul phoned his attorney, Mick Terrell ("Mr. Terrell"), who represents Defendants in this action, to touch base about next steps. Thereafter, Messrs. Paul and Terrell maintained "very regular" communications about implementing the Consent Judgment in a manner consistent with the FLSA. Paul Dep. 233:7–13, 236:9–10, 240:4–12, dkt. 47-1; *see also id.* at 92:1–20.[1] During his deposition, Mr. Paul recounted that, on an "ongoing" basis for approximately the last five years, Mr. Terrell has continued to share FLSA literature with him that "could be helpful in [Defendants'] daily operation[s] . . . ." *Id.* at 84:20–85:16. Mr. Paul also testified that "when [he] need[s] information, [he] contact[s] his attorney," hence his never having phoned the Wage and Hour Division's information helpline to inquire about FLSA compliance. *Id.* at 87:13–17. Although Mr. Paul himself has not participated in any FLSA courses, he indicated that a member his "HR department does" and, similarly, that one of his payroll department employees monitors developments in the Department's labor guidance and "will often email those" updates to him. *Id.* at 84:2–12, 88:17–86:17.

---

[1] Mr. Paul has waived his attorney-client privilege with respect to the legal advice he received about compliance with the Consent Judgment. Paul Dep. 234:7–11, dkt. 47-1.

### A.    Creation of Unified Payroll System

In early 2022, Mr. Paul's "biggest concern" was determining how to merge his companies' payroll systems. *Id.* at 246:7–11. In March 2022, Mr. Paul, with the aid of his legal counsel, created (non-party) TPS Medical Holdings, LLC ("TPS Holdings"), a payroll and holding company for Heal at Home, Comfort Keepers, and other non-party entities in order to ensure that all hours expended by his staff would be combined and compensated in accordance with the FLSA. *Id.* at 236:19–237:16. TPS Holdings currently manages payroll for more than 800 employees. *Id.* at 17:12–22, 88:21–89:20.

### B.    Changes to Employees' Regular Rates of Pay

Defendants' post-Consent Judgment operations included devising a process for paying employees the overtime premiums to which they are entitled while continuing the businesses as going concerns. As Mr. Paul framed the challenge during his deposition, he "had employees that were going . . .  from maybe working for one company thirty hours, another company thirty hours, another company thirty hours with no overtime and then all of the sudden this person was going to be at ninety hours with fifty hours of overtime." *Id.* at 250:11–16. In light of Medicaid's fixed reimbursement rates, Mr. Paul explained, the overtime expenses threatened "to destroy and devastate our financial well-being . . . ." *Id.* at 250:17–20.

At issue here are two categories of rate adjustments that Defendants made to their employees' regular rates of pay. We describe each below.

7

### 1.    Post-Consolidation Rate Adjustment

In March 2022, with Mr. Terrell's input and oversight, Defendants lowered the regular rates of pay for all field staff members employed by more than one TPS Holdings company. *See, e.g.*, *id.* at 238:2–18, 252:3–17. Affected employees received a written notice of the payroll change, *id.* at 90:14–20, 119:3–10, which notice explained that the "hours worked each week will be combined for payroll purposes," and employees "will receive one paycheck from TPS Medical Holdings." Dkt. 47-7 at 1. "In addition to [the] new payroll process," the notice stated, "we will also be making some modest reductions to our caregivers' base rate of pay. . . . [W]e anticipate that the new payroll process will result in . . . weekly pay remaining the same or even being higher . . . , depending upon the number of overtime hours worked." *Id.*; dkt. 51-10 (email chain with Defendants' counsel re: revisions to the written notice).

The parties agree that Defendants have utilized the adjusted regular rates to calculate and compensate their employees for all hours worked above forty per workweek. Dkt. 51 at 62. However, Wage and Hour Division Investigator Meghann Kennedy ("Investigator Kennedy") regards the post-consolidation rate adjustment as Defendants' "manipulation of employees' regular rates of pay to avoid their overtime obligations under the FLSA." Kennedy Decl. ¶ 29, dkt. 26-2.

### 2.    Rate Adjustments Based on a Significant Change in Condition

Many caregivers' and home health aides' weekly schedules include pre-approved overtime hours that fluctuate from week to week. *See* Paul Dep. 136:7–17, dkt. 47-1. In meeting the demands of acute patient and staffing needs, Mr. Paul routinely, though not

8

always, approves additional overtime hours on an as-needed basis. *Id.* at 74:20–75:12, 136:7–17, 138:14–141:5, 143:22–144:8; *see* Kennedy Dep. 127:5–19, dkt. 47-3. Indeed, Defendants have submitted numerous emails documenting approximately 200 occasions from January 2022 through September 2024 in which Mr. Paul approved overtime hours on limited bases. *See generally* dkt. 47-2.

At issue here is Mr. Paul's practice, which began in the spring of 2022, of reducing hourly rates in response to so-called "significant changes in condition." Paul Dep. 73:25–74:6, dkt. 47-1. In his deposition, Mr. Paul described a typical scenario as follows: After a material change in patients' health, CICOA oftentimes increases their respective care hour allotment. According to Mr. Paul, patients generally prefer consistency and request that their assigned caregiver and/or home health aide provide service during the additional care hours. *See id.* at 71:8–13.[2] Thus, an employee's weekly schedule could increase from forty to eighty-four hours, thereby entitling her to forty-four hours of overtime compensation. To mitigate the (potentially) dramatic impact on Defendants' operational sustainability, Mr. Paul's practice is to contact the affected employee, offer a reduced regular rate, and, if the employee accepts, to memorialize the agreement in writing (typically via a text exchange that Mr. Paul screenshots for recordkeeping purposes). *Id.* at 70:5–73:5; *id.* at 48:6–11, 73:6–74:1, 122:13–21 (rate reductions documented in writing); *see generally* dkt. 51-13

---

[2] The Secretary objects to this factual assertion, pursuant to Federal Rules of Evidence 402 and 403, arguing that whether "a patient or worker requests the same worker perform the additional overtime hours is irrelevant because Defendants, as the employer, have the authority and the responsibility to ensure compliance with FLSA overtime provisions." Dkt. 51 at 22. This objection is **OVERRULED**, insofar as Mr. Paul's testimony illuminates his state of mind, which is relevant to the Secretary's allegation that Mr. Paul intended to evade his overtime obligations.

(text message exchange re: pay change agreement). In Mr. Paul's words, "Nobody was ever forced to do anything. I would simply explain to them that it's a matter of business and they're not obligated to work the additional hours." *Id.* at 96:18–97:9.

Mr. Paul's practice of reducing rates of pay in the above-described manner is corroborated by the declarations of eight former employees, some of whom also claim that Mr. Paul did not disclose to them what their estimated weekly earnings would be at their existing regular rates. *E.g.*, Bauer Decl. ¶ 5, dkt. 51-2; Blades Decl. ¶¶ 4–6, dkt. 51-3; Bohannon Decl. ¶ 6, dkt. 51-4; Carpenter Decl. ¶ 4, dkt. 51-5; Carter Decl. ¶ 8, dkt. 51-6; Janis Decl. ¶¶ 3, 5, dkt. 51-7; dkt. 51-13 (text message exchange between employee Jasmine Janis and Mr. Paul); Reed Decl. ¶¶ 5–6, dkt. 51-8; Rodriguez-Cerena Decl. ¶ 3, dkt. 51-9. *Cf.* Turner Decl. ¶¶ 2–3, dkt. 51-1 (hired in May 2022 at a regular hourly rate of $11, despite her understanding that she "was supposed to be paid $14 an hour"); Osborn Decl. ¶ 35, dkt. 61-1. Investigator Kennedy states in her Declaration, albeit without identifying any specific examples, that "[m]any employees sign or otherwise 'agree' to their Pay Agreements after the rate change went [sic] into effect"; that some employees sign new pay agreements "each time" their hours changed, which is "sometimes as often as once a month"; and that, "[f]or other employees, Defendants fail to provide them with updated Pay Agreements . . . ." Kennedy Decl. ¶¶ 40–42, dkt. 26-2.

To the extent that an employee's weekly hours significantly decrease due to a subsequent and indefinite change, Mr. Paul's practice is to increase the employee's regular rate of pay. Paul Dep. 114:23–115:19, 123:23–124:24, 264:9–265:2, 266:21–268:3, dkt. 47-1. Following the July 2023 increase in Medicaid's reimbursement rates, several employees'

regular rates of pay were increased accordingly. Osborn Decl. ¶ 23, dkt. 61-1 (Ms. Carpenter's rate increased to $14.25 per hour); *id.* ¶ 35 (Ms. Turner's regular rate increased to $15 per hour); *id.* ¶ 42 (Ms. Rodriguez-Cerena's regular rate increased to $14.25 per hour).

      a.     <u>Mr. Paul's January 2023 Email Exchange with Mr. Terrell</u>

On January 11, 2023, one of Mr. Paul's staff members forwarded to him a recent news article reporting that a Pennsylvania district court had "ruled that you can't decrease wages to pay [overtime]" and had ordered the defendant homecare agency to pay $3.8 million in back wages. Dkt. 61-2 at 14. Mr. Paul promptly forwarded the news article to Mr. Terrell with this note: "This is VERY concerning. Can you please read the article below and give me your thoughts? I would then like to discuss how we are handling [overtime] and get your opinion." *Id.* at 13.

The following email exchange ensued, beginning with Mr. Terrell's response:

> [I]t is my understanding that you did a one-time reduction in hourly rates to take into account overtime. In the case you emailed me, the employer was using different hourly rates depending on whether the employee worked overtime. In other words, the employer was manipulating the rate on a regular basis to avoid the cost of overtime. Again, it is my understanding that you made a one-time change. That is different than this case.

*Id.*

Mr. Paul replied:

> Lets [sic] talk and I will explain how we are doing things.

> Example: Jill goes from working a 40 hour case at $15/hr. She now accepts a 60 hour case that will be a consistent/permanent case. We have her sign a new wage agreement at $13/hr and this will be her new rate of pay based on 60 hours.

*Id.* at 12. In response, Mr. Terrell indicated that he would "conduct some research" and "report back" accordingly. *Id.*

On January 16, 2023, Mr. Terrell asked Mr. Paul a series of specific questions about Defendants' payroll practices, which questions were promptly answered, in detail, by Ms. Osborn. *Id.* at 8–9.

On January 23, 2023, Mr. Terrell advised Mr. Paul as follows:

> We confirmed that [the FLSA] prohibits you from adjusting an employee's rate of pay for specific assignments/clients. As we discussed, unlike the facts here, the complaint filed by the [Department of Labor] against the [Pennsylvania] Homecare Agency involved allegations that the employer was lowering rates of pay for weeks in which the employees had already worked the overtime hours. Here, you would be adjusting rates of pay before hours are worked.
>
> Again, we still recommend having the employee sign a rate change document that shows he/she agreed to the new rate.

*Id.* at 6.

Mr. Terrell attested in his Supplemental Declaration that he has "had numerous conversations with Mr. Paul about the circumstances under which he . . . sometimes reduce[s] an employee's regular rate of pay." Terrell Suppl. Decl. ¶ 12, dkt. 61-2.  Mr. Terrell's legal advice, based on his understanding of the Department of Labor's guidance, is that employers are permitted to reduce an employee's rate of pay so long as the reduction is agreed to by the employee, intended to operate for a substantial period of time, and is greater than or equal to the federal minimum wage. *Id.*

## V.     The Instant Proceedings

On July 10, 2024, the Secretary initiated this contempt action, asserting that Defendants have violated the Consent Judgment by failing to adhere to the FLSA's overtime provisions. Dkt. 26.[3] More specifically, the Secretary avers that Defendants "repeatedly and willfully" (1) "manipulated employees' regular rates of pay during overtime weeks, effectively to pay employees at or near straight time for all hours worked; and" (2) "violated the FLSA's recordkeeping provisions by not recording the regular hourly rate for any work-week in which Defendants owed overtime due to falsified payrolls, by not maintaining accurate earnings due to falsified payrolls, and by not maintaining accurate records of premium pay for overtime hours due to falsified payrolls." Dkt. 26-1 at 2–3.

On January 31, 2025, Defendants moved for summary judgment on the Secretary's contempt petition, dkt. 47, arguing that neither the Consent Judgment nor the FLSA prohibits them from "mak[ing] certain changes to their employees' rates of pay." Dkt. 48 at 2. On March 3, 2025, the Secretary cross-moved for summary judgment, seeking an expansive array of remediations and penalties via a court order that (1) holds Defendants in civil contempt of the Consent Decree; (2) requires Defendants to pay for a third party to compute back wages; (3) compels Defendants to pay those back wages; (4) imposes a coercive daily fine on Defendants until they comply with the Consent Decree; (5) directs Defendants to demonstrate their adherence to the FLSA's overtime compensation provisions; (6) directs

---

[3] On July 10, 2024, the Secretary filed a second lawsuit against Defendants (and other related entities) asserting, *inter alia*, identical allegations relating to Defendants' rate adjustments. *Su v. TPS Caregiving, LLC*, No. 1:24-cv-01142-MPB-CSW (S.D. Ind. filed on July 10, 2024).

Defendants to prove that they have enacted a recordkeeping process for making, keeping, and preserving adequate and accurate employment, pay, and time records, as required by the FLSA; (7) requires Defendants to demonstrate that they have ceased manipulating their employees' rates of pay in order to avoid paying overtime premiums; (8) awards the Secretary her attorneys' fees and costs; and (9) imposes any further relief that the Court deems equitable and just. Dkt. 26 at 9–11; dkt. 51 at 66–69.

The parties' cross-motions for summary judgment are now fully briefed and ripe for ruling.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because summary judgment requires "no *genuine* issue of *material* fact," "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted). Where the movant seeks "summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the

14

claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so-one sided as to rule out the prospect of finding" in the non-movant's favor. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Id.*

## DISCUSSION

"Civil contempt proceedings are considered to be a part of the action from which they stem, their purpose being to secure compliance with a prior court order." *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993) (citation modified). "Given their supplemental character, the court normally will proceed in a more summary fashion than it would on an ordinary complaint." *Id.* "Because the contempt proceeding is concerned solely with whether or not the respondent's conduct violates a prior court order, the parties cannot reasonably expect to litigate to the same extent that they might in a new and independent civil action." *Id.* Additionally, "[c]ivil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019). "This standard reflects the fact that civil contempt is a severe remedy, and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* (citation modified).

To prevail on the contempt petition, the Secretary must establish by clear and convincing evidence that (1) the Consent Judgment sets forth an unambiguous command; (2) Defendants violated that command; (3) the violation was significant, meaning Defendants

did not substantially comply with the Consent Judgment; and (4) Defendants failed to make a reasonable and diligent effort to comply. *U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). The Secretary contends that Defendants violated the Consent Judgment, and thus acted in contempt of court, by lowering employees' regular wages with the goal of evading the FLSA's overtime obligations; and by failing to maintain complete and accurate payroll records, as the FLSA requires. Dkt. 26. We address these contentions below.

## I.    Overtime Violations

The Secretary maintains that Defendants violated the FLSA's overtime requirements by artificially reducing their employees' true regular rates for the purpose of evading their overtime obligations. The parties have expended a great deal of effort advocating their respective positions as to whether and under what circumstances the FLSA permits rate adjustments, such as those at issue here. After carefully reviewing the parties' briefs and cited evidence, however, it is clear to us that the Secretary's arguments fall short of satisfying her burden as to the third and final elements of civil contempt.

We begin with an analysis of the fourth element: the Secretary has failed to adduce clear and convincing evidence that Defendants did not undertake reasonable and diligent efforts to comply with the Consent Judgment. "Parties must make reasonable efforts to comply with our orders, not engage in crafty feints designed to avoid court-imposed obligations." *Nat'l Lab. Rels. Bd. v. Neises Constr. Corp.*, 62 F.4th 1040, 1053 (7th Cir. 2023) (citations omitted). Before a court may impose sanctions, the contempt petitioner must adduce evidence "that a party has willfully refused to comply with a court order[ ] or . . . that a party was not 'reasonably diligent' in carrying out the terms of the court order." *Bailey v.*

*Roob*, 567 F.3d 930, 935 (7th Cir. 2009). Because *scienter* is not a prerequisite to a finding of civil contempt, "[r]eliance on the advice of counsel . . . is not a defense." *S.E.C. v. McNamee*, 481 F.3d 451, 456 (7th Cir. 2007) (internal citations omitted). That said, such evidence can nonetheless be probative of whether an alleged contemnor energetically and diligently made efforts to comply with a court order. *See, e.g.*, *Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008); *Stotler & Co. v. Able*, 870 F.2d 1158, 1164–65 (7th Cir. 1989). At bottom, "a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Taggart*, 587 U.S. at 561.

The record here reveals a variety of measures undertaken by Defendants in an effort to comply with the Consent Judgment. Shortly after the entry of judgment in January 2022, Mr. Paul contacted his attorney, Mr. Terrell, in order to explore acceptable means of compliance, and thereafter they maintained regular communications with each other. *See, e.g.*, Paul Dep. 233:7–13, 236:9–10, dkt. 47-1; *id.* at 92:1–20; Terrell Suppl. Decl. ¶ 5, dkt. 61-2 (stating that many conversations occurred over the telephone; and that privilege log enumerates 409 attorney-client communications from January 2022 through September 2024 between Defendants and counsel). In March 2022, Mr. Paul took additional precaution by creating TPS Holdings to ensure that all staff members' hours were aggregated for payroll purposes. Kennedy Dep. 13:16–19, dkt. 47-3. Defendants also paid the entire amounts due for back wages. *Id.* Although the Secretary takes issue with the reductions to employees' regular rates of pay, the parties otherwise do not dispute that Defendants' system compensates every overtime hour at a time-and-a-half premium. Dkt. 60 at 5.

The Secretary's best evidence that Defendants failed to make a reasonable and diligent effort to comply with the Consent Judgment is found in the January 2023 email thread, wherein Mr. Paul expressed his concern over a news report that a Pennsylvania district court had sanctioned a homecare agency for its payroll practices. The Secretary cites Mr. Terrell's written "understanding" that Mr. Paul had "made a one-time change," thereby differentiating Mr. Paul's practices from those at issue in the Pennsylvania case. Dkt. 61-2 at 13. In the Secretary's view, Mr. Paul's concerns about the perceived commonalities between his payroll practices and those of the Pennsylvania homecare agency "plainly evidences their actual similarity." Dkt. 51 at 64. Likewise, the Secretary contends that Mr. Terrell's email response reveals Mr. Paul's failure to follow to the legal advice his attorney had given him, through Mr. Terrell's lack of awareness and approval of rate adjustments based on (purported) significant changes in conditions. Dkt. 51 at 63–64; dkt. 62 at 6.

We view this evidence as adduced by the Secretary to fall short of clear and convincing proof that Defendants failed to make reasonable and diligent efforts to comply with the Consent Judgment. Contrary to the Secretary's arguments, the January 2023 email thread is not nearly "so one-sided" as to lead to the conclusion that Mr. Paul shirked his obligations to follow a court order. *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601. We are more inclined to credit Mr. Paul's prompt follow-up with his attorney as evidence of his attentiveness to developments in labor law and his willingness to seek out legal advice when a reason to question and reevaluate his payroll practices arose. Likewise, assuming Mr. Terrell was unaware of Defendants' rate adjustment practices prior to January 2023, that fact alone does not clearly and convincingly establish that Mr. Paul failed to act

18

reasonably and diligently, especially given the contents of the complete email thread, which reveal that Mr. Paul (with Ms. Osborn's assistance) supplied Mr. Terrell with a detailed description of Defendants' pay practices in order to elicit legal advice that reflected all material facts. In short, the January 2023 email thread falls short of evincing, as the Secretary contends, clear and convincing proof of Defendants' failure to take reasonable and diligent efforts to adhere to the Consent Judgment.

Likewise, we find no persuasive evidence, in contrast to the Secretary's contention, that Defendants' alleged violations were "significant, meaning that the alleged contemnor[s] [have] not substantially complied with the" Consent Judgment. *Hyatt*, 621 F.3d at 692. Indeed, despite having cited this essential element in her contempt petition, dkt. 26-1 at 4, the Secretary has failed to address, much less develop any argument as to, this component of civil contempt in her summary judgment briefs. *See* dkt. 51, 62.

In sum, we find that the Secretary has not demonstrated by clear and convincing evidence that Defendants committed a significant violation of the Consent Judgment and that Defendants failed to make diligent and energetic steps to comply therewith. Her request for summary judgment on the contempt petition must therefore be **DENIED**. Dkt. 50. There being no genuine issues of material fact, Defendants are entitled to judgment as a matter of law, and their request for summary judgment shall be **GRANTED** accordingly. Dkt. 47.

## II.    Recordkeeping Violations

We next address Secretary's allegations that Defendants should be held in contempt based on alleged violations of the FLSA's recordkeeping provisions. *See* 29 U.S.C. §§ 211,

215(a)(5). We can make short work of this issue given that the Consent Judgment neither references Defendants' recordkeeping practices nor cites to the FLSA recordkeeping provisions. *See* dkt. 20. The Consent Judgment contains no clear and unambiguous command relating to recordkeeping, meaning that purported recordkeeping violations, assuming there were any, do not provide a viable basis on which to find Defendants in contempt. *See D. Patrick, Inc.*, 8 F.3d at 460 (stating that "a party can only be held in contempt for behavior clearly prohibited by a court order within its four corners.") (citation modified). Tellingly, in her cross-motion for summary judgment, the Secretary does not contend otherwise. Because we need not "consider arguments that were not presented . . . in response to summary judgment motions," we do not analyze the Secretary's recordkeeping allegations further. *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999); *see, e.g.*, *C & N Corp. v. Gregory Kane & Illinois River Winery, Inc.*, 756 F.3d 1024, 1026 (7th Cir. 2014).

## CONCLUSION

For the foregoing reasons, we hold that the Secretary has failed to establish by clear and convincing evidence that Defendants violated the Consent Judgment. Accordingly, Defendants' Motion for Summary judgment, dkt. 47, is **GRANTED**, and the Secretary's Motion for Summary Judgment, dkt. 50, is **DENIED**. In declining to issue contempt sanctions,

we express no view as to the merits of whether Defendants' current rate adjustment policies violate the FLSA.

    IT IS SO ORDERED.

Date:

        9/30/2025

                                              SARAH EVANS BARKER, JUDGE
                                              United States District Court
                                              Southern District of Indiana

Distribution:

Thomas Ransel Devoe
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
tdevoe@taftlaw.com

Haley R. Jenkins
United States Department of Labor
jenkins.haley.r@dol.gov

Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mmacchia@taftlaw.com

Andrew S. Murphy
TAFT STETTINIUS & HOLLISTER LLP
amurphy@taftlaw.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mterrell@taftlaw.com